IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| GARY WAYNE RODRIGUES, | ) | CV. NO. 10-00406 DAE-KSC |
| | ) | CR. NO. 01-00078 DAE |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## ORDER DENYING PETITIONER'S § 2255 MOTION

On January 7, 2011, the Court heard Petitioner's 28 U.S.C. § 2255

Motion to Vacate, Set Aside or Correct Sentence.  Lawrence Tong, Assistant U.S.

Attorney, appeared at the hearing on behalf of the Government; Eric Seitz, Esq.,

and Ronald Kim, Esq., appeared at the hearing on behalf of Petitioner.  After

reviewing Petitioner's motion and the supporting and opposing memoranda, the

Court DENIES Petitioner's 28 U.S.C. § 2255 Motion to Vacate, Set Aside or

Correct Sentence.  (Doc. # 408.)

## BACKGROUND

The underlying charges in the case stem from Petitioner Gary Wayne

Rodrigues' ("Petitioner") conduct while serving as the State Director of the United

Public Workers, AFSCME Local 646, AFL-CIO ("UPW").  ("Opp'n," Doc. # 413

at 3.) Hawaii Dental Services ("HDS") and the Pacific Group Medical Association ("PGMA") entered into contracts with the UPW, negotiated by Petitioner, to provide dental and health insurance to UPW members.[1] (Id. at 3, 11.) In negotiating these contracts, Petitioner asked the insurance providers to pay a percentage of the premiums received from UPW to UPW-designated "consultants." (Id. at 4.) Once agreed, Petitioner inserted provisions into the insurance contracts, whereby UPW would pay "consultant fees" as a part of their insurance premiums to HDS and PGMA. (Id.) The insurance companies, in turn, would provide the premiums to the UPW-designated consultant. (Id.)

The consultants in this scheme were Al Loughrin ("Loughrin"), and later, Petitioner's daughter Robin Haunani Rodrigues Sabatini ("Sabatini"), who at different times received the consulting fees from UPW. (Id. at 3, 5.) Loughrin was the "UPW Consultant" from October 2, 1992 until March 16, 1994. (Id. at 5 (citing Government's Excerpts of Record in Support of Government's Opposition "ER," at 82-83).) Loughrin was also the stepfather of Petitioner's girlfriend and secretary, Georgietta Carol, to whom Petitioner owed $10,000. (Opp'n at 5.)

---

[1] The indictment charged Petitioner and his daughter with Counts 1–50: Mail Fraud, as to the scheme based on contracts with HDS, and Count 56: Health Care Fraud, as to an almost identical scheme based on contracts with PGMA. (Id. at 3, 11.)

Between 1992 and 1994, HDS paid Loughrin $14,430.21 in "consulting fees." (Id.) Loughrin's widow and Carol both testified that Loughrin did not perform any consulting work for UPW in exchange for the fees. (Id. at 5.)

On March 16, 1994, Petitioner informed HDS that Loughrin was no longer a UPW consultant and directed that all consultant fees should be held until a new consultant was designated. (Id. at 6.) Thereafter, Petitioner designated Four Winds RSK, Inc. ("Four Winds") of Kapaa, Kauai as the "consultant." (Id. at 6 (citing ER at 84-86).) Sabatini was the sole shareholder of Four Winds, which was incorporated on February 13, 1996.[2] (Id. at 6 (citing ER 119-125.) Beginning on March 26, 1996 and through 1997, HDS continued to make quarterly payments to Four Winds.[3] (Id. at 6 (citing ER at 85–117).) At trial, various witnesses testified that they had no contact with Four Winds other than to send it checks and that they had never seen any work produced by Sabatini. (Id. at 7.) In late 1997, attention was drawn to Four Winds,[4] so Sabatini transferred Four Winds' assets to a new

---

[2] Four Winds is incorporated by Robin Rodrigues, which was Petitioner's daughter's name prior to her marriage on January 1, 1998. (ER at 126.)

[3] Additionally HDS also "cleared its books" by writing a check to Four Winds on March 25, 1996 which represented premiums paid by UPW for the period January 1994 through December 1995—before Four Winds was incorporated. (Opp'n at 5–6.)

[4] At the time, PGMA, which had also been paying premiums to Four Winds, went into receivership. (Id. at 7.) As a result the State of Hawaii insurance

company called Auli'i, Inc., which was incorporated using only her middle and maiden names. (Opp'n 7–8.) HDS began to indirectly make payments to Auli'i, Inc. in 1998. Petitioner had HDS pay the consulting fees to Voluntary Employees Benefit Association of Hawaii ("VEBAH").[5] VEBAH would then pay the fees to Management Applied Programming ("MAP"), which in turn paid Auli'i, Inc. (Id. at 8.) Sabatini at this time tried to make it seem as though she had performed consulting work, but in actuality all the documentation and work she submitted to MAP had been done by UPW employees. (Id. at 9.)

On April 10, 2002, the United States Government filed its Second Superseding Indictment ("Indictment") against Petitioner. (Doc. # 66.) The 102-count indictment included the following counts:

Counts 1–50, 18 U.S.C. § 1341: Mail Fraud.

Counts 51–55, 29 U.S.C. § 501: Embezzlement.

Counts 56, 18 U.S.C. § 1347: Scheme to Defraud a Health Care Program.

Count 57, 95, 18 U.S.C. § 1956: Money Laundering Conspiracy.

Counts 58–94, 96–100, 18 U.S.C. § 1956: Money Laundering.

---

commissioner served a subpoena on Four Winds requesting records concerning PGMA. (Id.) At that point a newspaper reported that Four Winds was owned by Petitioner's daughter. (Id. at 8.)

[5] Petitioner was a longtime director of this latter company. (Id. at 8.)

Count 101, 18 U.S.C. § 982: Forfeiture.

Count 102, 18 U.S.C. § 1954: Acceptance of Kickbacks in Connection with an Employee Welfare Benefit Plan.

Trial began on October 1, 2002, and the Government rested on November 8, 2002. On November 12, 2002, Petitioner filed a Motion for Judgment of Acquittal (Doc. # 170), which the Court denied on November 13, 2002 (Doc. # 173). The Court, however, found there was insufficient evidence to support the Government's "money or property" theory as to the mail fraud charges in Counts 1–50, but allowed the Government to proceed on its alternative theory that Petitioner schemed to deprive UPW and its members of their right to his honest services. (Doc. # 173.)

On November 19, 2002, the jury returned a verdict finding Petitioner guilty of all counts. (Doc. # 188.) The Court subsequently dismissed Count 101: Forfeiture, leaving Counts 1–100 and 102. On September 30, 2003, the Court sentenced Petitioner to sixty months as to Counts 1–55, sixty-four months as to Counts 56–100, and thirty-six months as to Count 102, with all terms to run

concurrently. (Doc. # 245.) On September 30, 2003, Petitioner filed a notice of appeal.

On June 11, 2007, the Ninth Circuit Court of Appeals affirmed the jury's verdict and ordered a limited remand pursuant to United States v. Ameline, 409 F.3d 1073 (9th Cir. 2005).[6] Specifically, the Ninth Circuit ordered "a limited remand for the sentencing judge to determine whether . . . he would have imposed the same sentences if he had known the guidelines were advisory." United States v. Rodrigues, Nos. 03-10549, 04-10027, 2007 WL 1675012, at *4 (9th Cir. June 11, 2007.) On September 28, 2007, this Court issued an Order Affirming Sentences. (Doc. # 329.) On October 2, 2007, this Court vacated its September 28, 2007 Order Affirming Sentences, finding that the views of counsel should be obtained in writing before deciding whether to resentence. (Doc. # 334.) On October 31, 2007, the Court affirmed Petitioner's sentence and Petitioner was ordered to self-surrender to begin service of his sentence on January 7, 2008. (Doc. # 343.)

---

[6] Ameline provides that "[i]f the district court judge determines that the sentence imposed would not have differed materially had he been aware that the Guidelines were advisory, the district court judge should place on the record a decision not to resentence, with an appropriate explanation." 409 F.3d at 1084.

On February 9, 2008, the United States Supreme Court denied

Petitioner's petition for a writ of certiorari. See Rodrigues v. United States, 552

U.S. 1186 (2008).

On July 16, 2010, Petitioner filed the instant 28 U.S.C. § 2255 Motion

("Motion"), seeking to vacate his conviction as to all counts. ("Mot.," Doc. # 408.)

On October 4, 2010, the Government filed its Opposition to the Motion. (Doc. #

413.) On the same day, the Government also filed the Government's Excerpts of

Record in Support of Government's Opposition. ("ER," Doc. # 414.) On

November 16, 2010, Petitioner filed a Reply. ("Reply," Doc. # 418.)

STANDARD OF REVIEW

The Court's review of a petitioner's motion is provided for by statute:

> A prisoner in custody under sentence of a court established
> by Act of Congress claiming the right to be released upon
> the ground that the sentence was imposed in violation of the
> Constitution or laws of the United States, or that the court
> was without jurisdiction to impose such sentence, or that
> the sentence was in excess of the maximum authorized by
> law, or is otherwise subject to collateral attack, may move
> the court which imposed the sentence to vacate, set aside or
> correct the sentence.

28 U.S.C. § 2255. The scope of collateral attack of a sentence under § 2255 is

limited and it does not encompass all claimed errors in conviction and sentencing.

United States v. Addonizio, 442 U.S. 178, 185 (1979). A one-year statute of

7

limitations is provided for in the statute, the limitation period to run from the latest of several possible dates.[7]  See 28 U.S.C. § 2255(f).

Under § 2255, the court shall hold an evidentiary hearing on a petitioner's motion "unless the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  The standard for holding an evidentiary hearing is whether the petitioner has made specific factual allegations that, if true, state a claim on which relief could be granted.  United States v. Schaflander, 743 F.2d 714, 717 (9th Cir. 1984).

An evidentiary hearing is not required if the petitioner's allegations, "when viewed against the record, do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal."  U.S. v. Leonti, 326 F.3d 1111, 1116 (9th Cir. 2003).  Mere conclusory statements, without supporting evidence, are not sufficient to require a hearing.  United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993).  Although the moving party is not

---

[7] Those dates include: (1) The date on which the judgment of conviction becomes final; (2) The date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed; (3) The date on which the right asserted was initially recognized by the Supreme Court, provided its made retroactively applicable to cases in collateral review; or (3) The date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.  28 U.S.C. § 2255(f).

required to detail his evidence, he must "make factual allegations" to establish his right to a hearing.  United States v. Hearst, 638 F.2d 1190, 1194 (9th Cir. 1980). The Court has discretion to ascertain whether a claim is substantial before granting a full evidentiary hearing.  Sanders v. United States, 373 U.S. 1, 18 (1963).  That discretion is limited, however, when a petitioner claims that he or she instructed his or her attorney to file an appeal and the attorney failed to do so.  United States v. Sandoval-Lopez, 409 F.3d 1193, 1197 (9th Cir. 2005).  In such situations, evidentiary hearings generally are necessary to determine whether the petitioner, in fact, made such an express instruction.  See id.

## DISCUSSION

Petitioner seeks to vacate his sentence as to Counts 1–100 and 102. (Mot. at 1.)  Petitioner's primary contention is that his conviction for honest services fraud is constitutionally barred given the Supreme Court's recent decision in Skilling v. United States, 130 S. Ct. 2896 (2010), where the Supreme Court narrowed the construction of 18 U.S.C. § 1346.  (See Mot. at 4.)  Petitioner further contends that, given the decision in Skilling, his conviction for money laundering based on his honest services fraud conviction is invalid as well.[8]  (Id. at 5.)

_____

[8] He also contends that his remaining conviction for money laundering is barred given the Supreme Court's decision in United States v. Santos, 553 U.S. 507 (2008).

Petitioner also claims that his conviction as to embezzlement and kickbacks is invalid for a number of reasons not stemming from any recent changes in the law. (Id. at 6–7.)  Finally, Petitioner alleges the Government engaged in prosecutorial misconduct.  (Id. at 10.)

I.      Timeliness of Petitioner's Motion

        The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs all federal habeas petitions filed after April 24, 1996.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997).  AEDPA amended 28 U.S.C. § 2255 by providing a one-year limitations period for federal prisoners to file federal habeas petitions under § 2255.  The relevant section of the statute states:

> A 1-year period of limitations shall apply to a motion under this section.  The limitation period shall run from the latest of -
>
>> (1) the date on which the judgment of conviction becomes final;
>>
>> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>>
>> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (4) the date on which the facts supporting the claim or

claims presented could have been discovered through the
exercise of due diligence.

28 U.S.C. § 2255(f).

As noted, the Supreme Court denied <u>certiorari</u> in the instant case on

February 9, 2008. Thus, according to § 2255(f)(1), the statute of limitations for

challenging the conviction per this statute expired on February 9, 2009, well before

Petitioner filed the instant petition on July 16, 2010. <u>See</u> <u>id.</u> § 2255(f)(1); <u>see also</u>

<u>United States v. Schwartz</u>, 274 F.3d 1220, 1223 (9th Cir. 2001) (adopting

definition of finality from <u>Griffith v. Kentucky</u>, 479 U.S. 314, 321 n.6 (1987),

which noted that conviction becomes final when the Supreme Court denies petition

for direct criminal appeals). To avoid this result, the Petitioner argues that each of

the counts for which he was convicted falls within the ambit of the Supreme

Court's decision in <u>Skilling,</u> where the Supreme Court narrowed the scope of the

honest services fraud crimes codified at 18 U.S.C. § 1346. As a result, according

to the Petitioner, § 2255(f)(3) dictates that the statute of limitations for his

challenge does not expire until June 24, 2011, a year after <u>Skilling</u> was decided,

thus rendering his petition timely filed. The Government, for its part, concedes

that Petitioner's challenges to those convictions based upon honest services fraud

were timely raised, but argues Petitioner's remaining grounds for vacating the

conviction are barred by the statute of limitations. (Opp'n at 17–18.)

A.      Statute of Limitations Analysis

As discussed, Petitioner first argues that his conviction as to Counts

1–50: Mail Fraud, and Count 56: Health Care Fraud, cannot stand in light of

Skilling.  (Mot. at 4.)  At trial, the Government submitted Counts 1–50 to the jury

on the theory that "the defendant knowingly devised a scheme or artifice to deprive

UPW and its members of their right to Petitioner Gary Rodrigues' honest services

as the state director of UPW," and submitted Count 56 to the jury on the theory

that "defendant knowingly and willfully carried out or attempted to carry out a

scheme or plan to deprive UPW's health care benefit program . . . of the intangible

right to Petitioner Gary Rodrigues' honest services . . . ."  (ER at 144, 149

(emphasis added).)  Because Counts 1–50 and 56 depended upon a finding of

honest services fraud, Skilling is on point and Petitioner's challenges to these

counts are timely.

Petitioner's challenges to Counts 51–55: Embezzlement (Mot. at 8),

however, are not timely.  Simply put, Petitioner's embezzlement charges did not

involve an honest services fraud scheme per 18 U.S.C. § 1346, but instead required

the jury to find that "defendant acted knowingly, unlawfully, and wilfully with the

fraudulent intent to deprive UPW of the use of its monies, funds, property, or other

assets."  (ER at 146.)  In other words, Petitioner was convicted of traditional

embezzlement to deprive a party of money or property in violation of 29 U.S.C.

§ 501(c), rather than honest services fraud.  Thus, the embezzlement counts are not

governed by Skilling.  Accordingly, the statute of limitations began running not

when the Supreme Court decided Skilling but instead when the Court denied

certiorari in the instant case on February 9, 2008.  See 28 U.S.C. § 2255(f)(1).  The

last day Petitioner could have brought a § 2255 challenge to these counts was

therefore February 9, 2009, well before the instant motion was filed.  Petitioner's

challenges to his convictions on Counts 51–55 are therefore not timely.

The Court reaches the same result with respect to Petitioner's

challenge to his conviction for money laundering (Mot. at 5), Counts 57–94, in

violation of 18 U.S.C. §§ 1956(h) and (a)(1)(B)(I).  Section 1956(a)(1)(B)(I)

establishes criminal penalties for

> [w]hoever, knowing that the property involved in a financial
> transaction represents the proceeds of some form of unlawful activity,
> conducts or attempts to conduct such a financial transaction which in
> fact involves the proceeds of specified unlawful activity . . . knowing
> that the transaction is designed in whole or in part . . . to conceal or
> disguise the nature, the location, the source, the ownership, or the
> control of the proceeds of specified unlawful activity.

18 U.S.C. § 1956(a)(1)(B)(I).  Mail fraud, health care fraud, and embezzlement of

union funds are all unlawful activities as contemplated by the statute.  See 18

U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(F), 1961(1).

Counts 58–62 involved laundering the funds of Petitioner's embezzlement proceeds relating to the HDS consulting fee scheme. As discussed above, the embezzlement scheme is independent of the Court's decision in Skilling. Therefore, Petitioner's attempt to launder funds related to this scheme are also independent of Skilling. Accordingly, Petitioner must have challenged his conviction on these counts by February 9, 2009.

Counts 63–94 related to laundered proceeds stemming from both embezzlement and mail fraud in connection with the HDS consulting fee scheme. On these counts, the jury issued special verdicts finding that Petitioner knew the underlying proceeds were the result of both the mail fraud and the embezzlement offense. (ER at 172–87.) Thus, even assuming that Petitioner's conviction of mail fraud could not stand in light of Skilling, these charges remain unaffected because one of the two predicated charge, i.e. embezzlement, is also unaffected. As with Counts 58–62, Petitioner must have challenged his conviction on these counts by February 9, 2009.

Count 57 charged a money laundering conspiracy in violation of 18 U.S.C. § 1956(h). Unlike Counts 63–94, however, the jury did not issue a special verdict to indicate which of the two predicate offenses (i.e. embezzlement or mail fraud) generated the proceeds to which Petitioner conspired to launder.

14

Nonetheless the Court concludes that, assuming the honest services offenses were invalid, Petitioner's challenge to the conspiracy count is untimely. Petitioner was convicted of substantive embezzlement offenses and substantive laundering offenses involving the proceeds of the embezzlement. The money laundering offenses included a finding that Sabatini deposited checks received from HDS and MAP. These acts were alleged to be an overt act in furtherance of the conspiracy. Thus, a jury could not have convicted Petitioner on the embezzlement and laundering counts without also finding that the conspiracy to launder was tied to the embezzlement as well. Put another way, in light of the jury's embezzlement and laundering convictions, it cannot be that the jury found the conspiracy was limited only to the proceeds of the honest services offenses and not the embezzlement offenses. Accordingly, this conviction stands notwithstanding any effect Skilling may have had on the predicate honest services conviction. It must therefore have been challenged by February 9, 2009.

Turning next to Counts 95–100, the Court finds that the convictions on these counts are directly related to Skilling and therefore are not time barred. Like Counts 57–94, these counts also related to money laundering. The predicate offense, however, was health care fraud related to the PGMA consulting fee scheme in violation of 18 U.S.C. § 1347, an honest services offense. (See ER at

15

55.)  Because the underlying fraud offense falls clearly into the scope of <u>Skilling</u>,

any conviction for laundering those funds are also called into question.

Petitioner's challenge to his convictions on Counts 95–100 are thus not time

barred.

Petitioner finally challenges his conviction on Count 102, which

charged him with accepting kickbacks in connection with the sale of life insurance.

(Mot. at 7.)  Petitioner asserts that Count 102 should not have been tried with

Counts 1–101.  He further argues that his due process rights were violated and he

was not given adequate time to prepare a defense when the Court denied his

motion to sever Count 102.  Petitioner made this same argument on appeal before

the Ninth Circuit, which affirmed this Court's joinder of the counts, finding that

"witnesses who gave testimony on the kickback count offered testimony relevant

to some of the other counts."  <u>United States v. Rodrigues</u>, 237 Fed. Appx. 178, 184

(9th Cir. 2007).  Petitioner may not relitigate this issue by way of a § 2255 motion.

<u>Olney v. United States</u>, 433 F.2d 161, 162 (9th Cir. 1970) ("Having raised this

point unsuccessfully on direct appeal, appellant cannot now seek to relitigate it as

part of a petition under § 2255.")  Further, to the extent that Petitioner argues that

he did not have enough time to prepare a defense and was thereby denied due

process rights for the first time, this claim is barred by the § 2255(f)(1) statute of limitations.[9]

Finally, Petitioner makes several arguments alleging prosecutorial misconduct (Mot. at 10) and challenging his sentence and amount of restitution ordered by the Court (Mot. at 12–14). These arguments do not relate to § 1346, the honest services fraud doctrine, or <u>Skilling</u>, and thus do not clearly fall within the one-year statute of limitations triggered by <u>Skilling</u> under § 2255(f). Petitioner must also have challenged his conviction on these grounds by February 9, 2009.

In sum, Petitioner's challenge to Counts 1–50, 56, and 95–100 relate to honest services fraud thereby falling within the ambit of the Court's decision in <u>Skilling.</u> They are therefore timely under § 2255(f)(3). Petitioner's challenge to Counts 51–55, 57–94, 102 as well as Petitioner's remaining charges do not relate to <u>Skilling</u> and are time barred by § 2255(f)(1).

B.   Equitable Tolling Analysis

The Supreme Court recently confirmed that AEDPA's statute of limitations "is subject to equitable tolling in appropriate cases." <u>Holland v. Florida</u>, 130 S. Ct. 2549, 2560 (2010); <u>see also</u> <u>United States v. Battles</u>, 362 F.3d

---

[9] Indeed, Petitioner's argument as to Count 102 does not fall into the ambit of <u>Skilling</u> and must therefore have been raised by February 9, 2009.

1195, 1197 (9th Cir. 2004) (holding that the statute of limitations in § 2255 is subject to equitable tolling). However, § 2255' s statute of limitations is only tolled where "extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time." Roy v. Lampert, 465 F.3d 964, 969 (9th Cir. 2006) (quotations omitted). Therefore, tolling is only appropriate where external forces, not a petitioner's lack of diligence, account for the delay in filing. Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999). Further, the Petitioner has the burden of demonstrating grounds that justify equitable tolling. See Espinoza-Matthews v. California, 432 F.3d 1021, 1026 (9th Cir. 2005); Miranda v. Castro, 292 F.3d 1063, 1065 (9th Cir. 2002).

Petitioner's first argument for equitable tolling is that he "did not know of [his] rights as an inmate to file a 2255 motion because [he] did not have funds to hire an attorney to advise or assist [him]." ("Pet'r's Tolling," Doc. # 408-8, at 1.) The Court finds that this allegation does not warrant tolling the statute of limitations. First, prisoners have no absolute right to counsel in a collateral attack on conviction. See Pennsylvania v. Finely, 481 U.S. 551, 555 (1987) (holding that the right to counsel "extends to the first appeal of right, and no further.") Second,

Petitioner has had some form of access to counsel until at least January 9, 2009.[10] As such, Petitioner's claim that "since [he] began [his] prison term [he has] not had any contact with any attorney on [his] criminal case," is inaccurate and not grounds for equitable tolling. (Pet'r's Tolling at 1.)

Petitioner's second argument for equitable tolling is that the legal resources at the Taft Correctional Institution, where he is imprisoned, were deficient. Specifically, Petitioner argues that he was not informed of legal procedures regarding inmate rights because the institution did not provide him with assistance on legal matters and the inmates have limited or no knowledge of legal procedures. Further, the institution has only five typewriters. (Pet'r's Tolling at 1–2.) However, this argument also fails to meet the standard for equitable tolling, as ignorance of the law does not qualify as an extraordinary circumstance meriting equitable tolling. See, e.g., Raspberry v. Garcia, 448 F.3d 1150, 1154 (9th Cir. 2006) (holding that "a pro se petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling" of the AEDPA

---

[10] Eric A. Seitz, Esq., Petitioner's counsel of record for several civil matters, including the instant motion as of August 26, 2010, filed a declaration as late as January 9, 2009. (Doc. # 373.) Petitioner also filed, through counsel, motions concerning his restitution obligations in August 2008. (Doc. # 353.) Both of these occurrences took place following February 9, 2009, when Petitioner's conviction became final, and within the one-year limitations period during which Petitioner could have brought his habeas petition.

statute of limitations); see also Hinton v. Pacific Enterprises, 5 F.3d 391, 396–97

(9th Cir. 1993) (finding that mere ignorance of the law is generally insufficient to

equitably toll the running of an applicable limitations period).[11]  Further, the Ninth

Circuit has previously held that extraordinary circumstances justifying the tolling

of the AEDPA statute of limitations may exist where the prison library was

inadequate because it did not contain the AEDPA statute.  Whalem/Hunt v. Early,

233 F.3d 1146, 1148 (9th Cir. 2000) (remanding for an evidentiary hearing where

the petitioner alleged the prison law library had no materials describing AEDPA);

Roy, 465 F.3d at 969 (remanding for an evidentiary hearing where prisoners

alleged that Arizona prison law library did not have any AEDPA materials).  Here,

however, Petitioner has not alleged he did not have access to AEDPA or any

materials interpreting AEDPA, but instead only that there were insufficient

typewriters and a library support staff that had only a limited knowledge of the

law.  Without more, the Court cannot conclude sufficient grounds exist for

equitable tolling.[12]

---

[11] The Court also notes that for many years, Petitioner was the head of one of
Hawaii's most powerful unions and is by no means an unsophisticated or
uninformed party.

[12] Under the circumstances, were the Court to agree with Petitioner that he
was entitled to equitable tolling based upon the facts he alleges, then virtually
every unrepresented prisoner would be entitled to equitable tolling.

Moreover, Petitioner fails to show that he sought out any materials on filing a habeas petition or that he was diligently pursuing his rights during the time that he requests equitable tolling. See Pace v. DeGuglielmo, 544 U.S. 408, 418 (2005) (holding that "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way"). He claims that, "the only method of obtaining some information about legal matters and procedures and inmates rights is by hearing other inmates conversations," but this fails to specifically show that he was diligently pursuing his rights or that the legal library at his prison was inadequate, or that any inadequacies actually caused his delay in filing. (Pet'r's Tolling at 2.) Petitioner also states that the "inmates that work in the library have limited or no knowledge of legal procedures." (Id.) A state must only provide its prisoners with the necessary tools to access the courts; a prisoner does not have a freestanding right to legal advice, access to a complete law library, or assistance with research and brief writing. See Lewis v. Casey, 518 U.S. 343, 354 (1996).

Because Petitioner has failed to show he made efforts to file a timely motion, or that he was subject to extraordinary circumstances that prevented him from doing so, Petitioner is not entitled to equitable tolling. His challenges to

Counts 51–55, 57–94, 102 and all other challenges unaffected by Skilling are

therefore barred by the one-year statute of limitations prescribed by § 2555(f)(1).[13]

II.    Petitioner's Conviction for Honest Services Fraud Under the New Skilling
       Standard

        Petitioner was convicted of Counts 1–50, 56, and 95–100, under the

honest services fraud doctrine.  Petitioner alleges that, by retroactively applying the

Supreme Court's interpretation of 18 U.S.C. § 1346 and the honest services fraud

doctrine in Skilling, his conviction as to those counts are no longer valid.

        A.    Retroactive Application of Skilling

        For Skilling to have any affect on Petitioner's conviction, it must be

applicable retroactively.  In Bousley v. United States, the Supreme Court held that

decisions of the Court which narrow the scope of substantial federal criminal

statutes or find that a substantive federal criminal statute does not reach certain

conduct, should be applied retroactively on habeas review.  523 U.S. 614, 620

(1998) (citing Teague v. Lane, 489 U.S. 288 (1989)).  Failure to apply such

holdings retroactively would "carry a significant risk that a defendant stands

_____

        [13] Petitioner also attempts to challenge his conviction for money laundering
based on the Supreme Court's decision in Santos, decided on June 2, 2008.  Even
assuming Santos was applicable, the one-year statute of limitations allowing a
Petitioner to challenge his conviction after Santos per § 2255(f)(3) expired on June
2, 2009.  Thus, Petitioner's claims under this theory are untimely as well.

convicted of 'an act that the law does not make criminal.'" Id. (quoting Davis v. United States, 417 U.S. 333, 346 (1974)). 18 U.S.C. § 1346 is a substantive criminal statute and Skilling "narrow[s] the scope of a criminal statute by interpreting its terms." Schriro v. Summerlin, 542 U.S. 348, 351–52 (2004). Because the decision in Skilling "[explains] its understanding of what the statute has meant continuously since the date when it became law," Rivers v. Roadway Express, Inc., 511 U.S. 298, 313 n.12 (1994), Skilling must apply retroactively to criminal convictions under 18 U.S.C. § 1346. Thus, Skilling is applicable retroactively to challenge Petitioner's conviction related to honest services fraud.

B.    Summary of Skilling

The defendant in Skilling was charged with, inter alia, conspiracy to commit honest services wire fraud in violation of 18 U.S.C. §§ 371, 1343, and 1346. The jury convicted Skilling of nineteen of the charges in the indictment, including honest services wire fraud. The Fifth Circuit, on appeal, affirmed the conviction. The Supreme Court granted certiorari to consider "whether Skilling's conspiracy conviction was premised on an improper theory of honest-services wire fraud." 130 S. Ct. at 2925–41. Rather than concluding that the honest-services wire fraud statute was unconstitutionally vague, the Court limited the statute's

construction, in large part due to a historical review of the honest services mail fraud doctrine.  Id.

The Court began its review of the history of the honest services fraud doctrine by describing it as "unlike fraud in which the victim's loss of money or property supplied the defendant's gain."  Id. at 2926.  The development of honest services fraud, as opposed to traditional fraud, applied in situations where "the offender profited, the betrayed party suffered no deprivation of money or property, [and,] instead, a third party, who had not been deceived provided the enrichment."  Id.  The Court went on to note that by 1982, every Court of Appeals had embraced the theory of honest services fraud.  Id. at 2927.

However, in 1987, the Supreme Court in McNally v. United States, 383 U.S. 350 (1987), "stopped the development of the . . . doctrine in its tracks."  Skilling, 130 S. Ct. at 2927.  In response to the ruling in McNally, Congress enacted § 1346 for the specific purpose of defining the right of honest services.  Id.  The Court determined that § 1346 intended to codify the body of honest services law that existed prior to McNally.  Id. at 2929.  As such, the Court examined honest services fraud cases prior to McNally and found that "[t]he 'vast majority' of the honest-services cases involved offenders who, in violation of a fiduciary

duty, participated in bribery or kickback schemes."[14] Id. at 2930 (citation omitted).

On the other hand, the Court explicitly chose to exclude undisclosed self-dealing as

criminalized conduct within the context of § 1346. Id. at 2932. Ultimately, the

Court concluded:

> In view of this history, there is no doubt that Congress intended
> § 1346 to reach at least bribes and kickbacks. Reading the statute to
> proscribe a wider range of offensive conduct, we acknowledge, would
> raise the due process concerns underlying the vagueness doctrine. To
> preserve the statute without transgressing constitutional limitations,
> we now hold that § 1346 criminalizes only the bribe-and-kickback
> core of the pre-McNally case law.

Id. at 2931 (emphasis added).

C.    Application of Skilling

The Court now turns to the charges in the instant case, and the effect

of Skilling on those charges. Petitioner challenges the jury instructions submitted

by the Court at trial based on the Government's honest services theory.

In the instant case, the jury instructions for Counts 1–50: Mail Fraud

required the jury to find that:

> First, the defendant knowingly devised a scheme or artifice to deprive
> UPW and its members of their right to Defendant Gary Rodrigues'

---

[14] The Court notes that in United States v. Milovanovic, 627 F.3d 405 (9th
Cir. 2010), the Ninth Circuit held that honest services mail fraud does not require
proof of a fiduciary relationship and did not require damages to money or property
of the victim. Id. at 413.

honest services as the state director of UPW; Second, the defendant acted with the intent to deprive UPW and its members of their right to the honest services of Gary Rodrigues; Third, the defendant knew or reasonably should have foreseen that the scheme could cause some economic or pecuniary harm to the UPW and its members. Pecuniary harm may include, but is not limited to, loss of services that were due; and Fourth, in advancing, or furthering, or carrying out, or attempting to carry out an essential part of the scheme, the defendant caused the use of the United States mails.[15]

(ER at 144.)

The Government concedes that the jury instructions used at trial exclude the second element of the post-<u>Skilling</u> Ninth Circuit Model Jury Instructions, which limits the offense to schemes involving bribery or kickbacks.[16]

---

[15] The Jury instructions for Count 56: Health Care Fraud are almost identical to the instructions for mail fraud, with the exception of a fifth finding that "UPW's health care benefit program was a health care benefit program." (ER at 149.) This is not at issue here. For this reason, the subsequent analysis applies equally to both Counts 1-50: Mail Fraud, and Count 56: Health Care Fraud.

[16] The 2010 Ninth Circuit Model Criminal Jury Instructions for "Mail Fraud – Scheme to Defraud – Deprivation of Right to Honest Services," modified to incorporate <u>Skilling</u>, require a jury to find that:

First, the defendant devised or knowingly participated in a scheme or plan to deprive [victim] of [his] [her] right of honest services; Second, the scheme or plan consists of a [bribe or kickback] in exchange for the defendant's services. The "exchange" may be implied from all the surrounding circumstances; Third, the defendant acted with the intent to defraud by depriving [victim] of [his] [her] right of honest services; Fourth, the defendant's act was material; that is, it had a natural tendency to influence, or was capable of influencing, [a person's] [an entity's] acts; and Fifth, the defendant used, or caused someone to use,

(Opp'n at 22.)  However, the Government argues that "any such error was harmless, as the jury's verdict demonstrates that it found the existence of each of the elements of honest services fraud."  (<u>Id.</u>)

Harmless error review means that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.  Fed. R. Crim. P. 52(a).  "A jury instruction that erroneously misstates or omits an element of the offense is a non-structural constitutional error subject to harmless error review." <u>United States v. Anchrum</u>, 590 F.3d 795, 799 (9th Cir. 2009) (citing <u>United States v. Smith</u>, 561 F.3d 934, 938 (9th Cir. 2009) (en banc)).  A reviewing court may determine that the omission of an element to the offense is harmless unless the instructions "had substantial and injurious effect or influence in determining the jury's verdict."  <u>Hedgpeth v. Pulido</u>, 555 U.S. 57, 57 (2008) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993)); <u>see also</u> <u>Skilling</u>, 130 S. Ct. at 2934, n.46.  Further, the Ninth Circuit has held that the harmless error standard applies to § 2255 actions.  <u>United States v. Montalvo</u>, 331 F.3d 1052, 1058 (9th Cir. 2003).  Thus, in applying the above standard to the instant case, the Court must examine the findings made by the jury.  The omission of the kickback or bribery element of

the mails to carry out or to attempt to carry out the scheme or plan.
Ninth Circuit Model Criminal Jury Instructions 8.123 (2010).

§ 1346 is harmless error unless it had a "substantial and injurious effect or influence" on the jury's determination.  See Hedgpeth, 55 U.S. at 57.

The Government argues that Petitioner's conduct constitutes a "classic kickback scheme."[17]  (Opp'n at 23.)  In Skilling, the Court concluded that the McNally case, which spurred Congress to enact § 1346, presented the classic kickback scenario, and thus exemplifies what Congress intended to criminalize in part with § 1346.  130 S. Ct. at 2930–31.  The Court went describe the facts in McNally as follows:

> A public official, in exchange for routing Kentucky's insurance business through a middle-man company, arranged for that company to share its commissions with entities in which the official held an interest.  This was no mere failure to disclose a conflict of interest; rather, the official conspired with a third party so that both would profit from wealth generated by public contracts.

Id. at 2932 (citations omitted).  The Court further defined the term 'kickback' as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining or rewarding favorable treatment in

---

[17] Skilling requires honest services fraud convictions under § 1346 to involve bribery or kickbacks.  As neither party makes any argument involving bribery, and it is clear that Petitioner's conduct was not bribery, the remainder of the Court's discussion involves whether Petitioner's conduct involved kickbacks.

connection with [enumerated circumstances]." Id. at 2934 (quoting 41 U.S.C. § 52(2)).

In the months since the Supreme Court's decision in Skilling, other courts have begun interpreting the holding as it relates to honest services fraud convictions. For instance, in United States v. Cantrell, the defendant used his position in public office to steer contracts and renewals to a third party in exchange for compensation from proceeds of the contracts. 617 F.3d 919, 922 (7th Cir. 2010). According to the Seventh Circuit, this constituted a kickback scheme under the Skilling analysis. Id. Specifically, the court determined that the proceeds given to the defendant by the third party, who reaped the benefits of the defendant's public position, constituted kickbacks. Id.

Similarly, the court in United States v. Scanlon, determined a defendant was involved in a traditional kickback scheme where a third-party convinced his clients to hire the defendant, and the defendant then secretly paid a percentage of profits gained from these clients to the third-party. - - - F. Supp. 2d - - -, No. 05-CR-411 (ESH), 2010 WL 4867613, * 1 (Nov. 30, 2010, D.D.C.).

Petitioner's conduct in the instant case can only be characterized as a kickback in the honest services fraud context. See Skilling, 130 S. Ct. at 2932. The Ninth Circuit, in affirming Petitioner's conviction, found that Petitioner

"us[ed] his ability to enter contracts on the unions behalf in order to secretly obtain money for himself or the person of his choosing in connection with those contracts." Rodrigues, 237 Fed. Appx. at 184. Petitioner's fraudulent scheme and receipt of benefits in the form of "fees" is precisely what the Supreme Court intended to include in § 1346 when the Court set forth the classic kickback scheme.

Here, Petitioner used his position within UPW to solicit and negotiate contracts with HDS and PGMA. HDS and PGMA received the benefit of those contracts provided they agreed to submit consulting fees to a consultant designated by Petitioner. As a result of these contracts, benefit was conferred upon the insurance companies in the form of business received, and payments were made to Petitioner's designated recipients for his personal benefit.

Petitioner argues that the facts of the case do not illustrate a kickback because "the government never showed that HDS or PGMA improperly obtained or were rewarded favorable treatment in connection with their contracts with UPW due to those payments." (Reply at 2.) However, Petitioner's assertion is belied by the record. Specifically, as noted, HDS and PGMA received favorable treatment from Petitioner in the form of continued business by agreeing to the consulting fees. Additionally, the Ninth Circuit found that the indictment for embezzlement "was based on the sending of money from the union to Hawaii Dental Service to

cover consultant fees," thus establishing the link between the money sent from UPW to HDS, and the money eventually received by Petitioner's "consultants". Rodrigues, 237 Fed. Appx. at 181. Accordingly, HDS and PGMA did "improperly obtain[] . . . favorable treatment in connection with" the payment of the consulting fees. Skilling, 130 S. Ct. at 2934 (defining kickback).

Petitioner also argues that the government failed to allege a kickback because "the consulting fee payments to Ms. Sabatini's companies were not payments to Petitioner." (Reply at 2.) The Court is not persuaded. The first "consultant" to receive fees from Petitioner's scheme was Loughrin. Petitioner indirectly gained significant benefit from these payments because they satisfied a $10,000 debt owed to Loughrin by Petitioner. Moreover, Sabatini, to whom payments were subsequently made, used the money to buy a truck for Petitioner, indicating that Petitioner also directly benefitted from the scheme. This alone is sufficient to warrant a finding that "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind" was provided to Petitioner. Skilling, 130 S. Ct. at 2934 (defining kickback).

Petitioner also received the benefit of payments made to Sabatini as she is Petitioner's daughter. Nothing in the law dictates that a kickback must take a certain form or be received only by the person charged. Indeed the Federal Anti-

Kickback statute requires only that a person "receive[] any remuneration . . . directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. § 1320a-7b(b); see also Skilling, 130 S. Ct. at 2934 (defining kickback as "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided directly or indirectly, to [enumerated persons] for the purpose of improperly obtaining or rewarding favorable treatment in connection with [enumerated circumstances]" (emphasis added) (quotation and citation omitted)). Therefore, the payments made to Loughrin and Sabatini are sufficient to unambiguously demonstrate that Petitioner received a benefit.

An examination of the jury instructions given at trial, specifically those for money laundering and embezzlement, further establishes a link between the assets unlawfully taken from UPW, and Petitioner by HDS and PGMA.  (ER at 21, 45-46.)  The jury instructions for embezzlement asked the jury to find, in part, that Petitioner "embezzled or stole or abstracted or converted to his own use or to the use of another, the monies, funds, property, or other assets of the UPW," and that Petitioner "acted knowingly, unlawfully, and willfully and with fraudulent intent to deprive UPW of the use of its monies, funds, property, or other assets." (ER at 145-146.)  The jury instructions for money laundering asked the jury to find that Petitioner "conducted a financial transaction involving property that

represented the proceeds of unlawful activity." (ER at 151.) The jury found Petitioner guilty of both embezzlement and money laundering, thus a link between the assets taken from UPW and Petitioner is readily established.

Petitioner further alleges that the facts of <u>Skilling</u> illustrate that the HDS and PGMA schemes were nothing more than undisclosed self-dealing. (Reply at 6.) The Court disagrees. In <u>Skilling</u>, the defendant, the former CEO of Enron, was accused of lying about a company's well-being to gain personal advantages such as salary, bonuses, grants of stock and stock options, profits and prestige. <u>Skilling</u>, 130 S. Ct. at 2908. The Court held that this was <u>not</u> a kickback or bribery scheme but instead mere self-dealing because the defendant had not "solicited or accepted side payments from a third party in exchange for making these misrepresentations." <u>Id.</u> at 2934. The facts of the instant case are easily distinguishable and actually further illustrate that Petitioner was involved in a kickback scheme. Petitioner here received a side-payment from HDS and PGMA in the form of a "consulting" fee which was used to pay off his debt and purchase a new car for Petitioner. In exchange, HDS and PGMA received UPW's continued business.

While this analysis demonstrates that Petitioner was involved in a kickback scheme, the Court must also determine whether the omission of a jury

instruction including kickbacks was harmless error. Using the standard outlined above, "[t]he question is, "whether, <u>in light of the record as a whole</u>," the error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Montalvo</u>, 331 F.3d at 1958 (quoting <u>Brecht</u>, 507 U.S. at 638) (internal quotations omitted). "This inquiry is not a matter of pure logic, but of sensitive judgment based on the case presented to the jury by the prosecution and the defense." <u>Montalvo</u>, 331 F.3d at 1958.

In the instant case, the Government's evidence against Petitioner was overwhelming. The Government presented letters, insurance contracts, and other hard evidence showing that Petitioner established "consulting fees" with the insurance companies (ER at 61, 68, 81), as well as evidence showing Loughrin and Sabatini as the "consultants" or beneficiaries of the consulting fees (ER at 82–82, 87–89). Based on the wealth of evidence against Petitioner, the jury found Petitioner guilty of 102 out of 102 Counts.[18] The facts relied upon by the jury in finding Petitioner guilty of all 102 counts including the counts for honest services fraud, money laundering, and embezzlement, are identical to the facts outlined above which illustrate that Petitioner received kickbacks. Because the facts necessary to establish that Petitioner received kickbacks were presented at trial and

---

[18] Count 101, as noted, was subsequently dismissed.

affirmed via guilty verdict by the jury, the omission of the kickback element at trial did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 638.

Furthermore, the Court determines that in light of the jury's verdict, as affirmed by the Ninth Circuit, it is clear that the jury had to have found that Petitioner engaged in a kickback scheme. The undisputed facts in evidence, relied upon in the Court's analysis of the kickback scheme, are not newly discovered or established. Thus, under the same set of facts, the jury would have found Petitioner guilty of receiving kickbacks in an honest services fraud scheme. Accordingly, the now-necessary element of a kickback, had it been included in the jury instructions at trial, would have resulted in the same verdict. Additionally, the Court concludes that the omission of the kickback element did not in any way impair the fundamental fairness of the proceeding. Therefore, the Court determines that Petitioner received kickbacks as a result of his mail fraud and health care fraud schemes, and that the failure to include a kickbacks element in the jury instructions was harmless error.

Accordingly, Petitioner's challenge to his conviction as to Counts 1–50 and 56 must fail. Petitioner's challenge to his conviction for Counts 95–100

for money laundering, predicated on a scheme or artifice to defraud a health care benefit program, fails as well.

CONCLUSION

For the reasons stated above, the Court DENIES Petitioner's 28 U.S.C. § 2255 Motion to Vacate, Set Aside or Correct Sentence. (Doc. # 408.)

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, January 31, 2011.



_____
David Alan Ezra
United States District Judge

Gary Wayne Rodrigues v. United States, Cv. No. 10-00406 DAE/KSC, Cr. No. 01-00078 DAE; ORDER DENYING PETITIONER'S § 2255 MOTION